UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOHN WILLIAM THOMPSON,<br><br>　　　　Petitioner,<br><br>　v.<br><br>ROBERT BURTON,<br><br>　　　　Respondent. | Case No. 3:03-cv-02711-JSC<br><br>**ORDER RE: MOTION TO DISMISS HABEAS AS BARRED BY THE STATUTE OF LIMITATIONS**<br><br>Re: Dkt. No. 71 |

Petitioner John William Thompson seeks federal habeas corpus relief from his state conviction under 28 U.S.C. § 2254. The action was stayed for eight years while Petitioner exhausted his state law remedies. Following exhaustion, Petitioner filed a third amended habeas petition and Respondent moved to dismiss the petition as untimely. (Dkt. Nos. 68, 71.[1]) After carefully considering the parties' briefs and the relevant legal authority, the Court concludes oral argument is unnecessary, *see* Civ. L.R. 7-1(b), and GRANTS Respondent's motion to dismiss.

**BACKGROUND**

In 1989, a Humbolt County jury found Petitioner guilty of first-degree murder and personal use of a firearm. (Dkt. No. 68 at ¶ 5.) Petitioner admitted he had two prior felony convictions and was sentenced to 32 years to life in a state prison. (Dkt. No. 68-1, Ex. E at 22-23.)

On February 15, 1991, Petitioner filed a counseled habeas petition in Humbolt County Superior Court which was denied on July 26, 1991. (Dkt. No. 68-1, Ex. G at 62-75.) Petitioner did not seek review in the California Supreme Court. (Dkt. No. 68 at ¶ 9.)

More than ten years later, on October 27, 2002, Petitioner, proceeding without

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

representation by counsel, filed a petition for writ of habeas corpus in the California Supreme Court, which the Court denied on March 26, 2003. (Dkt. No. 68 at ¶ 10.) Two months later, petitioner, still unrepresented by counsel, filed a habeas petition in the district court for the Eastern District of California. That action was transferred to this court on June 6, 2003 and assigned to the Honorable Saundra Brown Armstrong. (Dkt. No. 1.)

On April 14, 2004, the Court dismissed the petition with leave to amend and Petitioner amended his petition a month later. (Dkt. Nos. 6, 10.) On March 3, 2006, the Court issued an Order to Show Cause and Respondent moved to dismiss the petition as untimely. (Dkt. Nos. 11, 12.) Two months later, counsel appeared on Petitioner's behalf and contended he had obtained new evidence relevant to Petitioner's conviction. (Dkt. No. 13.) Petitioner then moved to stay the petition to allow him to exhaust his additional claims in state court. (Dkt. No. 21.) The Court granted that motion without ruling on Respondent's motion to dismiss. (Dkt. No. 31.)

Petitioner filed a second habeas petition in Humbolt County Superior Court on December 6, 2006, arguing

> 1) that petitioner is factually innocent of the murder of Verl Patton, based on the recantations of Eva Thompson and Eva Johnson;
>
> 2) that Keith Taylor's coercion of Eva Thompson and Eva Johnson to give false testimony at petitioner's trial violated Fourteenth Amendment due process right to a fair trial;
>
> 3) that the prosecution's failure to disclose to the defense that Keith Taylor had coerced the witnesses to give falsely incriminating testimony violated due process under *Brady v. Maryland*, 375 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995); and
>
> 4) that petitioner's trial counsel rendered ineffective assistance by failing to conduct a reasonably competent investigation, including locating Ernest Turtle and securing his testimony for the jury.

(Dkt. No. 68 at ¶ 12.) The superior court conducted a three-day evidentiary hearing in October 2009 and January 2010. (Dkt. No. 77, Ex. 5 at 20-182[2].) On April 10, 2010, the superior court

---

[2] Subsequent citations to the transcript of the evidentiary hearing submitted as Exhibit 5 to Respondent's reply (Dkt. No. 77) are to the transcript page and line number rather than the ECF page number.

denied the habeas petition. (Dkt. No. 68-1, Ex. E at 22-29.) It found the recantation testimony "not credible" and even if credible it did not "'undermine the entire prosecution case and point unerringly to innocence', or raise a 'reasonable probability that, had the false evidence riot been introduced, the result at trial would have been different.'" (*Id.* at 26-27.) The court also rejected Petitioner's ineffective assistance of counsel claim because he had not "met his burden of showing that the claimed deficiency of his counsel's representation resulted in actual prejudice." (*Id.* at 28.)

More than ten years after the superior court denied the habeas petition following the evidentiary hearing, on May 4, 2020, Petitioner filed a motion on his own seeking to proceed in this action. His counsel subsequently moved to withdraw. (Dkt. Nos. 41, 42.) The Court granted counsel's request to withdraw and directed Petitioner to file a second amended habeas petition, which he did. (Dkt. Nos. 43, 44, 45.) On March 22, 2021, the Court denied Petitioner's motion to lift the stay because the record did not demonstrate Plaintiff had exhausted his two new claims for:

> (1) ineffective assistance of counsel for failing to "properly investigate to find vital witnesses to prove the fact that Petitioner was not the person who committed the murder";
>
> (2) "newly discovered evidence" that the "State's main witness, who testified that Petitioner told her that he was the one who committed the murder of the victim re-canted her testimony. . ."

(Dkt. No. 46 at 3 (quoting Dkt. 45 at 7).) The Court also denied Petitioner's motion for appointment of counsel. (Dkt. No. 48.)

The case was reassigned to the undersigned judge on September 15, 2022. (Dkt. No. 54.) Petitioner again moved for appointment of counsel, which the Court granted. (Dkt. No. 58.) The Court then vacated the appointment of counsel, referred Petitioner to the Court's appellate panel for appointment of counsel, and Geoffrey Jones was then appointed as counsel for Petitioner. (Dkt. Nos. 60, 61.)

On September 13, 2023, Petitioner, through counsel, filed a habeas corpus petition with the California Supreme Court raising six claims for relief. (Dkt. No. 68 at ¶ 14; Dkt. No. 68-1, Ex. H at 75.) The California Supreme Court denied the petition in a summary order on March 20, 2024. (Dkt. No. 68-1, Ex. P at 182.)

Two months later, Petitioner moved to lift the stay and file the now operative Third Amended Habeas Petition. (Dkt. Nos. 67, 68.) The Third Amended Habeas Petition sets forth the same six claims challenging the constitutionality of petitioner's conviction:

(1) violation of due process under the Fourteenth Amendment based on actual innocence;

(2) violation of the Sixth Amendment based on ineffective assistance of counsel for failing to conduct a reasonably competent pre-trial investigation;

(3) violation of the Sixth Amendment based on ineffective assistance of counsel for failing to request a continuance of trial until a witness could be located;

(4) violation of the Sixth Amendment based on ineffective assistance of counsel for failure to timely file a motion to suppress the recording of Petitioner's illegal interrogation by police;

(5) violation of the Sixth Amendment based on ineffective assistance of counsel for failure to timely challenge the jury pool composition; and

(6) violation of the Sixth Amendment based on ineffective assistance of counsel so pervasive it rendered Petitioner's trial fundamentally unfair.

(Dkt. No. 68.) The Court granted the motion to lift the stay and issued an Order to Show Cause to Respondent. (Dkt. No. 69.) Respondent then moved to dismiss the petition as untimely. (Dkt. No. 71.) After extensions of the briefing schedule, that motion is now fully briefed. (Dkt. Nos. 72, 74, 76, 77.)

**DISCUSSION**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on petitions for a writ of habeas corpus filed by state prisoners. 28 U.S.C. § 2244(d)(1). Under AEDPA, petitions challenging non-capital state convictions or sentences must be filed within one year of the date on which: (A) the judgment became final by the conclusion of direct review or the time expired for seeking direct review; (B) an impediment to filing an application created by unconstitutional state action was removed, if such action prevented petitioner from filing; (C) the constitutional right asserted was initially recognized by the Supreme Court, if the right was newly recognized by the Supreme Court and made retroactive to cases on collateral review; or (D) "the factual predicate of the claim or claims presented could have been

discovered through the exercise of due diligence." *Id*. If the petitioner fails to file a petition before the expiration of the statute of limitations, the petitioner is barred from proceeding on his claims unless tolling applies. *See Chaffer v. Prosper*, 592 F.3d 1046, 1048-49 (9th Cir. 2010). Under AEDPA, whether Petitioner's habeas claim is time-barred is "a threshold question that must be decided *before* reaching the merits" of the claims. *Ford v. Gonzalez*, 683 F.3d 1230, 1238 (9th Cir. 2012) (emphasis in original).

Because Petitioner's conviction became final prior to AEDPA's passage, his federal habeas corpus petition was presumptively due on April 24, 1997, a year after the Act's passage. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) ("AEDPA's one-year grace period for challenging convictions finalized before AEDPA's enactment date is governed by Rule 6(a) and ended on April 24, 1997 in the absence of statutory tolling."). Petitioner filed his initial federal habeas petition on June 11, 2003. (Dkt. No. 1; Dkt. No. 68 at 7.) However, under the prison mailbox rule, the date Petitioner delivered the petition to prison authorities, October 27, 2002, is deemed the filing date for purposes of the statute of limitations. *See Huizar v. Carey*, 273 F.3d 1220, 1222 (9th Cir. 2001). Although Petitioner concedes his petition was filed approximately six years after the due date, he contends his petition should nonetheless be considered timely because: (1) under 28 U.S.C. § 2244(d)(1)(D) the statute of limitations did not begin to run until 2006; (2) he is entitled to equitable tolling; and (3) the "actual innocence gateway" of *Schlup v. Delo*, 513 U.S. 298 (1995), allows him to overcome his petition's untimeliness.

### A.     Section 2244(d)(1)(D) Accrual

Under Section 2244(d)(1)(D), the statute of limitations begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." The "'due diligence' clock starts ticking when a person knows or through diligence could discover the vital facts, regardless of when their legal significance is actually discovered." *Ford*, 683 F.3d at 1235.

Petitioner contends the statute of limitations should not begin to run until 2006 because that is when he discovered the factual basis for his claim; namely, that two key witnesses from his trial, Eva Thompson (his ex-wife) and Eva Johnson (his stepdaughter), had recanted their

5

1  testimony. Petitioner concedes he knew they were lying at the time of his trial, but contends he
2  had no way to get them to admit they were lying; thus, their recantations constitute newly
3  discovered evidence. (Dkt. No. 68 at 8.) Not so. Their false testimony is the evidence on which
4  his petition is based and the witness declarations are the means of presenting that evidence. *See*
5  *Flanagan v. Johnson*, 154 F.3d 196, 199-200 (5th Cir. 1998) ("[petitioner] argues that the lawyer's
6  affidavit forms part of the factual predicate of his suit" because it supports his "claim that he was
7  not informed of his right not to testify [but he] is confusing his knowledge of the factual predicate
8  of his claim with the time permitted for gathering evidence in support of that claim."). The
9  limitations period runs from the date the petitioner could have discovered the factual predicate of
10 his claim through the exercise of due diligence, not from the date the petitioner obtained
11 evidentiary support for his claim.³ *See Hasan v. Galaza*, 254 F.3d 1150, 1154-55 (9th Cir. 2001).
12 Petitioner is thus not entitled to any delayed accrual of the statute of limitations. *See Ford*,
13 683 F.3d at 1236 ("Because the vital facts underlying [petitioner's claims] could have been known
14 long before the state appellate process ended, § 2244(d)(1)(D) does not provide [petitioner] with a
15 later accrual date than § 2244(d)(1)(A).")

### B.    Equitable Tolling

"[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Fla.*, 560 U.S. 631, 649 (2010) (cleaned up). The extraordinary circumstances prong "is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control." *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 257 (2016). The "exercise of a court's equity powers must be made on a case-by-case basis" and "enables courts to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices." *Holland*, 560 U.S. at 649–50. "The petitioner bears the burden of showing that this extraordinary exclusion should apply to him." *Milam v. Harrington*, 953 F.3d 1128, 1132 (9th Cir. 2020) (cleaned up).

---

³ Further, petitioner was appointed counsel for purposes of his initial habeas petition in 1991—counsel who could have helped develop this claim. (Dkt. No. 68-1, Ex. G at 66.)

1    Petitioner contends he is entitled to equitable tolling because in January 1997 his mother
2    hired an attorney, Russell Clanton, to file a federal habeas petition on Petitioner's behalf, but he
3    did not do so. (Dkt. No. 68 at 7.) Respondent insists Petitioner has shown neither extraordinary
4    circumstances nor diligence.

5    "Equitable tolling may be warranted in instances of unprofessional attorney behavior;
6    however, the AEDPA deadline will not be tolled for a garden variety claim of excusable attorney
7    neglect or mistake." *Doe v. Busby*, 661 F.3d 1001, 1011–12 (9th Cir. 2011). When a petitioner
8    seeks to excuse an untimely filing based on attorney error, "courts must examine if the claimed
9    failure was one of mere negligence by the attorney, such as inadvertently miscalculating a filing
10   deadline in a non-capital case, or a sufficiently egregious misdeed like malfeasance or failing to
11   fulfill a basic duty of client representation." *Id*. (cleaned up). For example, "affirmatively
12   misleading a petitioner to believe that a timely petition has been or will soon be filed can
13   constitute egregious professional misconduct." *Luna v. Kernan*, 784 F.3d 640, 646 (9th Cir.
14   2015). In *Luna*, appointed counsel voluntarily dismissed petitioner's timely but unexhausted and
15   stayed federal habeas petition, delayed in filing his state habeas petition with the state court of
16   appeals and supreme court, and then waited four years before filing his fully exhausted federal
17   habeas petition. *Id*. at 644-45. The court concluded this conduct amounted to egregious
18   professional misconduct.

19   Petitioner argues Mr. Clanton engaged in similar egregious professional misconduct. In
20   his verified First Amended Petition he alleges that his mother retained Mr. Clanton to file the
21   habeas petition on Petitioner's behalf and that she did so as of January 22, 1997. (Dkt. No. 72-1,
22   Ex. J at 110.) Despite being so retained, he never filed such a petition. *See Laws v. Lamarque*,
23   351 F.3d 919, 924 (9th Cir. 2003) (stating court "must construe pro se habeas filings liberally, and
24   may treat the allegations of a verified complaint or petition as an affidavit.") (internal citations
25   omitted). [4] But even if the Court accepts as true Petitioner's mother retained Mr. Clanton in

---

[4] While the Court accepts the allegations of the habeas petition as true, the Court acknowledges the evidence in the record is not clear as to whether Mr. Clanton was retained to review Petitioners' case file or file a habeas petition. (Dkt. No. 68-1, Ex. Q at 197 (May 13, 1997 letter from Mr. Clanton stating he had been retained to "conduct a review of [his] case history" and he

7

January 1997—three months before the statute of limitations expired—Plaintiff has not met his burden of demonstrating diligence. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) ("AEDPA's one-year grace period for challenging convictions finalized before AEDPA's enactment date is governed by Rule 6(a) and ended on April 24, 1997").

Over four years elapsed between when Petitioner's mother retained Mr. Clanton and Petitioner filed his unrepresented habeas petition with the California Supreme Court. Petitioner contends in his motion to dismiss opposition that he and his mother "communicated with Clanton and monitored his progress during this time." (Dkt. No. 71 at 19.) However, Petitioner's first amended habeas petition alleges that Petitioner's mother "complained of the inaction of Attorney Clanton" in June 2000 (Dkt. No. 72-1, Ex. J at 110), and attaches as support what appears to be a statement from Mr. Clanton stating he received a letter from Petitioner's mother in 1999 "express[ing] dissatisfaction with the services I had rendered to date, (*id.* at 118.) Then, in October 2001, Mr. Clanton sent Petitioner's mother a letter returning a portion of the retainer because he understood she was "dissatisfied with the work I performed on behalf of your son, John Thompson." (Dkt. No. 72-1, Ex. J at 119.) But Petitioner did not file his habeas petition with the California Supreme Court until more than a year after Mr. Clanton returned the fee to his mother. While Petitioner notes he had provided Mr. Clanton the state court record and suggests it is "unclear" if Mr. Clanton returned the record (Dkt. No. 72 at 19-20), Petitioner knows whether and when the record was returned and it is his burden to demonstrate diligence. To be sure, "equitable tolling may be appropriate when a prisoner had been denied access to his legal files," but Petitioner has not argued his legal files were not returned until a particular date, but rather, that it is unknown when or if they were returned. *Spitsyn v. Moore*, 345 F.3d 796, 801 (9th Cir. 2003), as amended (Nov. 3, 2003).

The cases upon which Petitioner relies do not support a finding of egregious professional misconduct. In *Doe v. Busby*, the petitioner "hired his former counsel to file a federal habeas

---

"hope[d] to discover something substantial enough to warrant some action in this case."); *see also* Dkt. No. 68-1, Ex. R at 204 (May 13, 1997 letter from Mr. Clanton to Petitioner discussing his review of the case and enclosing a retainer agreement for Petitioner's signature). As discussed below, however, it is unnecessary to resolve this issue.

1  petition more than one year prior to the AEDPA deadline," paid him a $20,000 advance, provided
2  him with files, and made "repeated[] inquiries on the progress of his case" and "when [his]
3  attorney finally informed him that no petition was forthcoming after four years of representations
4  to the contrary and then delayed six months in returning [petitioner's] files, [the petitioner]
5  managed to file []his Petition in ten days." 661 F.3d at 1012; *see also Spitsyn* 345 F.3d at 801
6  ("Though he was hired nearly a full year in advance of the deadline" counsel failed to prepare or
7  file a petition, petitioner and his mother repeatedly attempted to contact counsel "but these efforts
8  proved fruitless" and "despite a request that he return [petitioner's] file, [the counsel] retained it
9  for the duration of the limitations period and more than two months beyond."). Here, in contrast,
10 counsel was retained only three months before the expiration of the statute of limitations and
11 Petitioner waited more than a year after counsel returned a portion of the fee due to client
12 dissatisfaction.

   Accordingly, Petitioner has not met his burden "of showing that this extraordinary
14 exclusion should apply to him." *Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002).

   **C.   Actual Innocence Exception to Statute of Limitations**

16 A federal court may hear the merits of untimely claims if the failure to hear the claims
17 would constitute a "miscarriage of justice." *See McQuiggin v. Perkins*, 569 U.S. 383, 391-93
18 (2013) (holding that miscarriage of justice (actual innocence) showing applies to claims filed after
19 the AEDPA statute of limitations has run, as well as to successive, abusive and procedurally
20 defaulted claims). In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court limited the
21 "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional
22 violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327
23 (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "In order to pass through the actual
24 innocence gateway of *Schlup*, [Petitioner] must show that, in light of all available evidence, it is
25 more likely than not that no reasonable juror would convict him of the relevant crime." *Smith v.*
26 *Baldwin*, 510 F.3d 1127, 1140 (9th Cir. 2007) (citing *House v. Bell*, 547 U.S. 518 (2006)). That
27 is, the test is whether it is "more likely than not any reasonable juror would have reasonable
28 doubt." *House*, 547 U.S. at 538. This "standard is demanding and permits review only in the

9

extraordinary case." *Id.* (quotation omitted). "[T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial" and "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* (cleaned up).

Petitioner contends he is factually innocent and relies on the declarations of his ex-wife, Eva Thompson, and his stepdaughter, Eva Barber, recanting their trial testimony. (Dkt. No. 68 at 8.) At trial, both witnesses testified they picked Petitioner up the night of the murder and he told them he shot "someone." (Dkt. No. 68-1, Ex. H at 79 (Oct. 17, 1989 superior court order denying motion for new trial); Dkt. No. 68-1, Ex. S at 230 (Aug. 8, 1991 court of appeal order affirming denial of new trial motion); Dkt. No. 68-1, Ex. S at 281 (Barber trial testimony).) Ms. Thomson and Ms. Barber's 2006 declarations attest their testimony was the result of coercion by Keith Taylor, who was a manager with the Humbolt County Indian Justice Project at the time of the incident. (Dkt. Nos. 68-1 at Ex. A (Thompson Decl.), Ex. B (Barber Decl.).) Ms. Thompson attests "[w]hen I picked him up that night, John Thompson told me that someone had been shot. I immediately told him I didn't want to know any more." (Dkt. No. 68-1, Ex. A., Thompson Decl. at ¶ 5.) Ms. Barber attests "[a]t no time did my stepfather John Thompson ever say that he shot or killed somebody." (Dkt. No. 68-1, Ex. B, Barber Decl. at ¶ 6.)

Following receipt of these declarations, the superior court ordered an evidentiary hearing at which Mr. Taylor and Ms. Thompson testified. (Dkt. No 77, Ex. 5, Thompson Evid. Hrg. Test. at 72-86; Ex. 5 Taylor Evid. Hrg. Test. at 114-138.) Although a private investigator attempted to locate Ms. Barber prior to the evidentiary hearing, he was unable to do so and she did not testify. (Dkt. No. 77, Ex. 5 at 89-92.) At the evidentiary hearing, when Ms. Thompson was asked if her trial testimony—that Petitioner told her he shot Mr. Patton—was true, she testified:

> It was so long ago, all I remember is picking him up in the condition that he was in and that he had told me that somebody had been shot there and that he wasn't -- he never said yes. He never said no. I asked him. He wouldn't reply.

(Dkt. No. 77, Ex. 5 at 85.) Mr. Taylor testified that he knew Ms. Thompson and her daughter in his capacity as a project manager in a youth diversion program with the Humbolt County Indian

10

1  Justice Department. (*Id*. at 114.) Ms. Thompson had requested his assistance with issues with her
2  daughter. (*Id*. 116-17, 133.) Around this same time, she reached out to him for advice about what
3  do so after Petitioner, following the murder, asked her to wash cloths and boots with blood on
4  them and dispose of the barrel of a gun. (*Id*. at 118.) Mr. Taylor advised her to tell the authorities
5  about what happened, but he denied coercing or pressuring her to testify against Petitioner. (*Id*. at
6  119, 123-124, 126.)

### 1. Deference to the Superior Court's Credibility Finding

In April 2010, the superior court denied the habeas petition finding Mr. Taylor's testimony credible, and Ms. Thompson and Ms. Barber's declaration testimony, and Ms. Thompson's evidentiary hearing testimony not credible. (Dkt. No. 68-1, Ex. E at 26.) In particular, the superior court found Ms. Thompson and Ms. Barber were "influenced by a personal relationship with petitioner and a personal interest in how the matter is decided" and their testimony was "not reasonable when considered in light of the totality of evidence presented at the trial in this matter." (*Id*.)

Under § 2254(e)(1), in proceedings evaluating a prisoner's habeas petition, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)); *see also Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir. 2004) ("[B]ecause the state court conducted an evidentiary hearing…we are required to defer to the state court's credibility findings.").

Petitioner insists the state court's credibility determination was "conclusory" and thus cannot "be considered a reasonably obtained finding of fact." (Dkt. No. 72 at 8.) This argument is unavailing. "[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 300 (2013) (citing *Coleman v. Thompson*, 501 U.S. 722, 739 (1991) ("[W]e have no power to tell state courts how they must write their opinions")). Further, there was no clear error in the superior court's reliance on Ms. Thompson and Ms. Barber's relationship with Petitioner as a basis for the credibility finding. The relationship of the witnesses recanting their testimony to the petitioner is a factor the court can

11

consider in weighing their credibility. *See Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014) (noting because the "recantations are all from [Petitioner's] family members, [this] reduces their weight and reliability") (citing *House v. Bell*, 547 U.S. 518, 552 (2006) (noting testimony by friends or relations of the accused might have less probative value than testimony from disinterested witnesses); *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (noting family members might have a personal stake in a defendant's exoneration)). Petitioner has not offered any evidence in rebuttal. *See Sophanthavong*, 378 F.3d at 867 ("has the burden of rebutting the presumption that a state courts determination of the factual issues is correct by clear and convincing evidence."); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (holding "Title 28 U.S.C. § 2254(d) gives federal habeas corpus courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state court, but not by them.").

### 2. Insufficient Evidence of Actual Innocence

Considering all the evidence, old and new, Petitioner has not met the "extraordinarily high" burden of demonstrating the actual innocence exception applies. *Jones*, 763 F.3d at 1251.

First, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013). Ms. Thompson and Ms. Barber's declarations and recantations were made over 15 years after Plaintiff was convicted. In her declaration Ms. Thompson attests she has "always been reluctant to do what I am now willing to do," but does not explain why she was willing to come forward after all that time. (Dkt. No. 68-1, Ex. A at ¶ 14.) At the evidentiary hearing, she testified she thought the district attorney's office was aware of Mr. Taylor's coercion because he "had walked her and her daughter to the police department to talk to Officer Swanson." (Dkt. No. 77, Ex. 5 at 77:14-20.) Later, she clarified she never told anyone because she thought "they all were in on it together." (*Id*. at 83:4-23.) But she does not offer any explanation as to why she came forward 15 years later. Ms. Barber likewise offers no explanation for her delay in coming forward. (Dkt. No. 68-1, Ex. B.) Thus, "[t]he timing of the recantations casts some doubt on their veracity." *Jones*, 763 F.3d at 1249; *see also McCray*, 499 F.3d at 573 (discounting evidence from witnesses who did not provide a good explanation for why they delayed in coming forward).

12

Second, even if Ms. Thompson and Ms. Barber's testimony were credible and "even assuming the jury were to believe their recantations over their trial testimony," their declarations are not "compelling evidence of [Petitioner's] innocence." *Jones*, 763 F.3d at 1249. "Because neither witnessed the [murder], their testimony is of little weight in the actual innocence analysis." *Id*. (citing *Schlup*, 513 U.S. at 324 (identifying "trustworthy eyewitness accounts" as evidence that might be sufficient to show actual innocence). In their declarations, Ms. Thompson and Ms. Barber both describe their knowledge of what happened as "limited." Ms. Barber attests "[a]t no time did my stepfather John Thompson ever say that he shot or killed somebody. On the contrary, on the only occasions he talked about the incident, he said that Chopi shot the victim, who I later learned was Verl Patton." (Dkt. No. 68-1, Ex. B at ¶ 6.) For her part, Ms. Thompson does not attest Mr. Thompson told her he did *not* shoot anyone, but rather that he refused to talk about it. (Dkt. No 68-1, Ex. A at ¶¶ 5-7.) And at the evidentiary hearing she testified:

> It was so long ago, all I remember is picking him up in the condition that he was in and that he had told me that somebody had been shot there and that he wasn't -- he never said yes. He never said no. I asked him. He wouldn't reply.

(Dkt. No. 77, Ex. 5 at 104.) Ms. Thompson also testified that she told the truth "to the best of my ability" at Petitioner's 1989 trial. (*Id.* at 84:20-85:3.)

This evidence, taken in combination with the evidence presented at trial, is not sufficient to cause the Court to "'lose confidence in the outcome of the trial.'"[5] *Stewart*, 757 F.3d at 942 (quoting *Schlup*, 513 U.S. at 316). The evidence at trial was that in the days preceding the murder Petitioner had been in a fight and had been seen on multiple occasions carrying a rifle around town. (Dkt. No. 68-1, Ex. F at 33-35.) On the day of the murder, Petitioner called a friend, Connie Cummings, to ask her to bring him his gun saying "somebody had kicked him in the head and they weren't going to get away with it." (*Id*. at 36.) Ms. Cummings brought Petitioner his gun and then drove him to a place called the Pigeon Coop which is where the murder occurred. (*Id*.) Petitioner "grabbed the rifle and got out of the car, gesturing as if loading the rifle" and Ms.

---

[5] While the complete trial transcripts are not part of the record, the court of appeals summarized the trial evidence in its 1991 order affirming the denial of Petitioner's motion for a new trial. (Dkt. No. 68-1, Ex. F at 31-59.)

13

1    Cummings drove off. (*Id*.) She had just arrived home when Petitioner called to say "something
2    heavy duty has come down" and asked her to come get his gun. (*Id*.) When she declined, he
3    asked her to call his wife (Eva Thompson) to come get him. (*Id*.) When Ms. Thompson picked
4    Petitioner up, he told her he had shot someone. (*Id*.) Ms. Thompson drove Petitioner to pick up
5    his gun and he told her and her daughter (Ms. Barber) not to say anything. (*Id*. at 36-37.)
6    Petitioner gave Ms. Thompson his clothes to wash and they had "barn-red or brown paint" on the
7    knees. (*Id*. at 37.) Later, Petitioner had Ms. Thompson and Ms. Barber help disassemble the
8    gun—burning the wooden parts and placing the metal parts in a bag Petitioner disposed of off a
9    jetty. (*Id*. at 37-38.)

10   Neither Ms. Thompson nor Ms. Barber's declarations recant their testimony regarding his
11   clothes or the destruction of the gun, and their trial testimony regarding both are consistent with
12   Mr. Taylor's testimony at the 2010 evidentiary hearing. So, even taking Ms. Thompson's new
13   testimony as true that petitioner did not tell them he had shot someone, but rather that "someone
14   had been shot," the changed testimony does not cause the Court to "'lose confidence in the
15   outcome of the trial,'" as it does not undermine their testimony regarding the condition of
16   Petitioner's clothes or the destruction and disposal of his gun following the murder, or the other
17   trial evidence regarding his possession of the gun. *Stewart*, 757 F.3d at 942 (quoting *Schlup*, 513
18   U.S. at 316).

19   Ms. Barber's declaration statement that Petitioner told her "Chopi shot the victim" also
20   does not cause the Court to lose confidence in the trial's outcome. "[A] witness' recantation is
21   considered in addition to his trial testimony and in the context in which he recanted when
22   assessing the likely impact it would have on jurors." *Jones,* 763 F.3d at 1248 (citing *Christian v.*
23   *Frank*, 595 F.3d 1076, 1084 n.11 (9th Cir. 2010) (considering the timing of the witness'
24   recantation and the contents of his earlier testimony in assessing the weight of the recantation);
25   *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003) (noting that a recanting witness had given
26   numerous contradictory statements in assessing the weight to give to his new testimony)). Ms.
27   Barber's declaration is in direct contradiction to her trial testimony that Petitioner "said he shot
28   some guy" when he got in the car. (Dkt. No. 68-1, Ex. S at 281.) Further, her declaration does not

state he told her Chopi did it at the time of the murder, but rather that "on the only occasions [Petitioner] talked about the incident, he said that Chopi shot the victim." (Dkt. No. 68-1, Ex. B ¶ 6.) That Petitioner accused someone else of committing the murder he was accused of committing does not undermine his conviction.

The only other evidence supporting Chopi as the shooter theory is the purported eyewitness testimony of Ernst Turtle who was sitting on same couch with the victim at the time of the shooting. (Dkt. No. 68-1, Ex. G at 65.) Mr. Turtle, who was interviewed by police five hours after the incident at which point his blood alcohol level was .29, said he heard a car door open and close and someone walked up to the victim and shot him. (Dkt. No. 68-1, Ex. F at 45.) According to Mr. Turtle, the shooter was shorter than Petitioner, spoke with "a strong Mexican accent" and his street name was "Chopi." (*Id.*) Mr. Turtle could not be located at the time of trial, but he testified at Petitioner's motion for new trial—20 months after the shooting. The superior court denied Petitioner's motion for a new trial, and the court of appeals affirmed, finding "it was not probable that Turtle's testimony would have resulted in a different outcome [because] the evidence that appellant killed the victim is very strong." (Dkt. No. 68-1, Ex. F at 47; *see also* Dkt. No. 68-1, Ex. G at 65, 74-75.) The court of appeal rejected Turtle's testimony, noting

> Fragoso, whom Turtle accused of the shooting, was the person who reported it to the authorities, and it is unrealistic that he would have reported a crime he himself had committed. Furthermore, there was no evidence of animosity between Fragoso and the victim, or that Fragoso owned or possessed a gun, and nothing in the testimony of the other witnesses suggested he was the culprit.

(Dkt. No. 68-1, Ex. F at 47.)

Having considered the new evidence against the entire record, the Court finds Petitioner has not met his burden of demonstrating this an "extraordinary case" because it is more likely than not "no reasonable juror would find him guilty beyond a reasonable doubt" when considering the totality of the record. *House v. Bell*, 547 U.S. 518, 537-38 (2006).

***

In sum, because Petitioner has not demonstrated he is entitled to delayed accrual of the statute of limitations under 28 U.S.C. § 2244(d)(1)(D), or that equitable tolling applies, or that

*Schlup's* "actual innocence gateway" allows him to overcome the untimeliness of his petition, his habeas petition, which was filed over six years after the statutory deadline, is barred by the statute of limitations.

## CONCLUSION

For the reasons stated above, the Court GRANTS Respondent's motion to dismiss the habeas petition as untimely.

This Order disposes of Docket No. 71.

**IT IS SO ORDERED.**

Dated: February 27, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge